<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LOU PENA,<br><br>          Plaintiff,<br><br>     v.<br><br>NEW MEADOWLANDS RACETRACK LLC, ET AL.,<br><br>          Defendants. | Civil Action No.  12-2 (SRC)<br><br>**OPINION & ORDER** |

<u>**CHESLER, U.S.D.J.**</u>

This matter comes before the Court on the application of Plaintiff Lou Pena ("Plaintiff") for an Order Temporarily and Preliminarily Enjoining Defendants New Meadowlands Racetrack, LLC ("NMR"), Jeffrey Gural ("Gural"), New Jersey Sports and Exposition Authority ("NJSEA"), Dennis Robinson ("Robinson"), and Peter J. Koch ("Koch").[1]  For the reasons that follow, Plaintiff's application will be denied.

BACKGROUND

In brief, this case arises from the exclusion of Mr. Pena, a horse trainer, from the New Meadowlands Racetrack facility ("Meadowlands").  According to the Verified Complaint, Mr. Pena has enjoyed a twenty-year career as a trainer of standardbred, harness racing horses, and was named as a top trainer at the Meadowlands and Yonkers Racetracks in 2010 and 2011.  Mr.

---

[1] Lightening Lanes Stables, LLC, also filed an Amicus Brief, which the Court will not consider, as the submission appears to be an improper joinder, and the proposition advanced by the Brief (namely, judicial estoppel) is inapplicable to this case.

Pena holds a valid training license in New Jersey, where such licenses are issued by the New Jersey Racing Commission ("NJRC"). Pena has been very financially successful in his profession, earning approximately $15 million dollars in purses over the past two years.

Meadowlands is owned by a New Jersey State agency, the NJSEA, but management of the racetrack was transferred to NMR, a private company, as of December, 2011. Specifically, NJSEA executed a 31-year ground lease of Meadowlands to NMR, effective December 24, 2011, and the NJRC granted NMR a provisional permit to operate the racetrack. The lease between NJSEA and NMR provides, among other things, that management of the racetrack shall be according to the "sole business judgment" of NMR and Defendant Gural (the Managing Member of NMR), although they must adhere to all applicable laws, rules and regulations pertaining to horseracing. (Ver. Compl., Ex. A.1.) Moreover, NMR "shall have the authority to permit or deny the participation of owners, drivers, trainers and other Persons" at the Meadowlands racetrack. *Id.* NMR shall pay rent in the amount of one dollar for the first five years, then the greater of $500,000 or 10% of NMR's net operating profits for the remaining term of the lease. *Id.*

Defendant Koch was hired as Director of Racing and Racing Secretary for NMR.[2] According to his Certification, when NMR assumed operation of the racetrack, it required all trainers desiring to race a horse at Meadowlands to submit a "2011-12 Standardbred Racing

---

[2] Mr. Koch was also the Racing Secretary for Meadowlands when it was operated by NJSEA, until September of 2011. In his capacity as Racing Secretary for NMR, Mr. Koch receives no compensation from the NJSEA or other governmental agency. (Koch Cert., § 7.) In New Jersey, the Racing Secretary has various duties related to the orderly running of races, and ensures compliance with related regulations, N.J.A.C. 13:71-8.35, whereas the Racing Commission and other appointed officials address licensing and discipline of horse trainers and drivers. N.J.A.C. § 13:71-7.1 *et seq.*, 13:71-8.1 *et seq.*

Application." (Koch Cert., ¶ 8.) On December 13, 2011, Plaintiff submitted a formal application to participate as a trainer for a number of horses. Mr. Koch, as Director of Racing, informed Plaintiff that his participation at the racetrack "is not in the best interest of the ownership of the facility," via letter (on NMR letterhead) dated December 27, 2011, and via a phone call on December 28, 2011. *Id.* at ¶¶ 15-18; Ver. Compl., Ex. B. Mr. Koch avers that the decision to deny Plaintiff's application was made by Mr. Gural in his sole discretion, and was not made by or at the discretion of the NJSEA. Plaintiff, for his part, avers that Mr. Koch did not give any other basis for Plaintiff's exclusion from the racetrack, other than the determination that Pena was "detrimental to horse racing at the Meadowlands." (Ver. Compl., ¶ 33.) Indeed, Plaintiff avers that Mr. Gural "has made public statements that he does not want Pena racing at the Meadowlands, for no apparent reason other than that Pena is winning so many races." *Id.* at ¶ 39. Mr. Pena was not given a hearing prior to his exclusion, nor was he informed of a means by which he could appeal the decision. Plaintiff having nominated and paid for five horses to be eligible to race in various series in the 2012 racing season, he inquired whether these horses would be permitted to race. Mr. Koch informed him that the horses could not race if Mr. Pena was listed as the trainer.

Plaintiff asserts that the decision to bar him, a licensee in good standing, from Meadowlands, was not authorized by statute, and was a violation of his due process rights under the Fourteenth Amendment to the United States Constitution. He argues that his exclusion is tantamount to a revocation or suspension of his license, and will devastate his business reputation. Plaintiff avers that he has suffered, and will continue to suffer irreparable harm as a result of this unlawful exclusion, including harm to his ability to pursue his profession, his reputation, training and racing opportunities. Therefore, Plaintiff seeks an injunction temporarily

and preliminarily enjoining the Defendants from further excluding him from the Meadowlands racetrack. Defendants oppose the motion, arguing that NMR lawfully exercised its common law right of exclusion in barring Mr. Pena from the racetrack, and that the NJSEA did not participate in the decision to exclude him.

## ANALYSIS

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." FED. R. CIV. P. 65; *Winter v. NRDC, Inc.*, 129 S. Ct. 365, 374 (2008). Injunctive relief is an extraordinary remedy, which should be granted only in limited circumstances. *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988) (citing *United States v. City of Philadelphia*, 644 F.2d 187, 191 n.1 (3d Cir. 1980)). Thus, "a movant 'must demonstrate *both* a likelihood of success on the merits, and the probability of irreparable harm if relief is not granted.'" *Frank's GMC Truck Center*, 847 F.2d at 102 (quoting *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir. 1987)). A preliminary injunction cannot be granted where "either or both of these prerequisites are absent." *Id.* (quoting *In Re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982)).

With respect to the first factor, the movant must show a "reasonable probability" of ultimate success on the merits of his claim. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 900 (3d Cir. 1989). Here, Plaintiff seeks relief under 42 U.S.C. Section 1983, arguing that his summary exclusion from Meadowlands without a hearing violates his due process rights under the Fourteenth Amendment. For the reasons that follow, the Court concludes that Plaintiff has not shown a reasonable probability of success on the merits of this claim, because, on the

record before this Court, he has not made an adequate demonstration that his exclusion from the Meadowlands racetrack constitutes state action for the purposes of section 1983.

>Section 1983 provides, in pertinent part:
>
>Every person who, under color of any statute, ordinance, regulation . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

To prevail under this section, a plaintiff must therefore show 1) the violation of a right secured by the Constitution or federal law, and 2) that the alleged deprivation occurred under color of state law, or constituted state action. *Moore v. Tartler*, 986 F.2d 682, 685 (3d Cir. 1993). Whether private conduct, such as the conduct of a private person or business, constitutes state action is a fact-intensive inquiry. *Crissman v. Dover Downs Entertainment, Inc.*, 289 F.3d 231, 233-34 (3d Cir. 2002) (en banc), *cert. denied*, 537 U.S. 886 (2002). Although the Third Circuit's articulations of the applicable analysis in this context are far from clear, this Court will primarily rely on *Crissman*, an *en banc* decision concluding, after full discovery, that a private racetrack's exclusion of the plaintiffs (licensed race-horse owners and trainers) did not constitute state action for the purposes of section 1983. *Id.* at 247. In that case, the defendant Dover Downs, a private corporation which owned and operated a racetrack facility in Delaware, was a state-licensed harness racing association, and a state-licensed video lottery agent. *Id.* at 234. The general manager of harness racing for Dover Downs excluded the Crissmans from the facility by way of a "one-sentence letter," and refused to explain the exclusion. *Id.* at 234-35. The Crissmans conceded that the state of Delaware had no direct involvement in the decision to exclude them from the racetrack, but argued that heavy state regulation of horse-racing, and state revenue from Dover Downs rendered it a state actor for purposes of section 1983. *Id.*, at 248-39. The District

Court concluded that the Crissmans had not demonstrated that state regulation and revenue from Dover Downs rendered it a state actor under the symbiotic relationship test set forth in *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961). *Id.* Moreover, it concluded that there was no "close nexus" between the state and the exclusionary conduct, and thus there was no state action under the analysis set forth in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974). *Id.* A panel of the Third Circuit reversed the District Court, "reasoning that *Burton* had established an exception to the general rule that the state must be involved in the challenged conduct, and that Burton permitted state action to be based on . . . facts demonstrating what it termed 'overall involvement of the State in the affairs of the private entity.'" *Id.* at 239.

The Third Circuit, sitting *en banc*, overturned this holding, and framed the essential approach as follows: whether the exclusion of the Crissmans from Dover Downs was *fairly attributable* to the state. *Id.* (emphasis added) (noting that the central purpose of the state action inquiry is to 'assure that constitutional standards are invoked when it can be said that the State is responsible for the *specific conduct* of which the plaintiff complains.') (emphasis added) (citing *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)). It reasoned that the applicability of *Burton's* "symbiotic relationship" test is narrow, and was premised on the unique involvement and interdependence of the state and the private entity in that case, where essential state revenues flowed from a discriminatory restaurant operation. *Id.* at 241-42. It then concluded that, in the case of Dover Downs, Delaware "was not conducting any operations together with the race track," although it regulated the racing activity, and licensed the racetrack, nor was the flow of monies to and from Delaware tied to the exclusion of the Crissmans. *Id.* at 243-45. Indeed, the Court explicitly reiterated that detailed regulation does not equate to state action, nor does the flow of funds to or from the state. *Id.*, at 243-44 (citing

*Jackson*, 419 U.S. at 350, and *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 544 (1987)).  Hence, Dover Downs' exclusion of the Crissmans was not fairly attributable to the State of Delaware under the symbiotic relationship analysis.[3]

The Circuit likewise found no "close nexus" between Delaware, and the racetrack's exclusion of the Crissmans.  *Id.* at 246.  The Crissmans argued that the state had delegated sufficient authority to the private racetrack to make it an agent of the state, through the racetrack's power to make eligibility determinations, to operate as a monopoly during certain months of the year, and to enforce the Racing Commission's rules and regulations.  *Id.* at 247-48.  The Circuit found these arguments unpersuasive because they had no direct bearing on the *specific decision* to exclude the Crissmans.  *Id.* (noting that the racetrack's role in overseeing compliance with rules and regulations did not make it an "executive arm" of the Commission.)

Here, Plaintiff argues[4] that his exclusion from Meadowlands is fairly attributable to the State of New Jersey because: 1) there is a symbiotic relationship between the state and the racetrack, particularly given that a state entity leases the land and facility to NMR; 2) there is a "close nexus" between the exclusion of Plaintiff and the state, because the exclusion was "on behalf of the NJSEA," and pursuant to an agreement between NMR and the NJSEA.  Both arguments fail.  First, in considering whether there is a unique "interrelationship" between NMR

---

[3]In reaching this conclusion, the Third Circuit distinguished the case relied upon by Plaintiff in this case: *Fitzgerald v. Mountain Laurel Racing, Inc.*, 607 F.2d 589 (3d Cir. 1979).  It observed that the private racetrack's exclusion of a licensed trainer and driver without a hearing was deemed state action in that case not because of the "heavily regulated racing industry," but "based on the direct involvement of racing officials in the conduct."  *Crissman*, 289 F.3d at 236, fn.5, 245 fn.17.

[4]In light of the emergent nature of Plaintiff's application, the Court will address Plaintiff's arguments as set forth in his written brief, and as placed on the record during oral argument on January 9, 2012.

and the State of New Jersey, such that the exclusion of Mr. Pena is fairly attributable to state, the only salient fact distinguishing the case at bar from *Crissman*, based on the current state of the record, is the lease arrangement between NJSEA and NMR. In *Crissman*, Dover Downs was privately owned and operated; here, Meadowlands is owned by New Jersey, but leased to, and operated by NMR, a private company. However, the mere leasing of property by the state to a private entity "does not give rise to wholesale government responsibility for the actions taken by a . . . private tenant." *Gannett Satellite Info. Network, Inc. v. Berger*, 894 F.2d 61, 67 (3d Cir. 1990). State action will only be recognized "where the public might reasonably conclude from [the] relationship that the government has lent its support to the private entity's actions." *Crissman*, 289 F.3d at 243 (quoting *Gannett*, 894 F.2d at 67). The 31-year lease agreement between NJSEA and NMR indicates that, although New Jersey remains the owner of the racetrack, operation of the racetrack is in the hands of NMR. Indeed, NMR is the entity licensed by the NJRC to operate races at the Meadowlands. Moreover, the harness races are hardly a "public function," such that the very operation of the races transforms NMR's behavior into a government function. *Gannett*, 894 F.2d at 67 (citing *Jackson*, 419 U.S. 345). In short, the Court is not convinced that New Jersey's relationship as a lessor of the Meadowlands changes the analysis set forth under *Crissman*, which is otherwise fully applicable to this case. As in *Crissman*, although harness-racing is heavily regulated in New Jersey, and although the state may derive revenue from the Meadowlands operation, these factors do not establish a symbiotic relationship between the state and NMR such that Mr. Pena's exclusion is fairly attributable to New Jersey. 289 F.3d at 242.

Moreover, at this point, Plaintiff has failed to show a close nexus between his exclusion from the Meadowlands, and the State of New Jersey, because he has failed to produce evidence

of any direct participation by state officials in the exclusionary decision. Though Plaintiff argues that Director Koch's correspondence informing Plaintiff of his exclusion, was "on behalf of NJSEA," and that NMR and NJSEA conspired to exclude Plaintiff, there is no evidence to support this contention. First, although Koch (a privately-paid employee of NMR) is the Racing Secretary for the Meadowlands, which entails regulatory duties, those duties are, in New Jersey, unrelated to the discipline or exclusion of horse trainers or drivers. *See* N.J.A.C. 13:71-8.35; *contra Fitzgerald*, 607 F.2d at 598 (noting that the racing secretary who participated in the expulsion of the plaintiff, a licensed trainer and driver, from the track, had acted pursuant to his "delegated authority from the State [of Pennsylvania]," concluding that plaintiff had violated a Racing Commission Rule regarding inconsistent driving). Moreover, Plaintiff himself vigorously argues that (unlike Fitzgerald) he was not expelled for violation of Racing Commission rules or regulations; rather, the NJRC conducted a recent, extensive investigation of Pena, and found no basis to take action against his license. (Ver. Compl., ¶ 22.) These facts suggest that the decision to exclude Plaintiff was not a regulatory decision "packaged" as a decision by NMR, but was indeed a business decision made by NMR as a private entity. Second, Defendants present Koch's uncontradicted certification that the decision to exclude Plaintiff was made in Mr. Gural's sole discretion as the Managing Member of NMR, and "was not made by or at the direction of the NJSEA." (Koch Cert., ¶ 7.) Indeed, the Court notes that Koch did not exclude Plaintiff during his recent tenure as Racing Secretary when the Meadowlands was operated by the State of New Jersey. On the other hand, Plaintiff has been excluded from two facilities which are apparently affiliated with Mr. Gural: Tioga Downs Racing and Vernon Downs Racing, both located in the State of New York. *Id.*, ¶ 12. Third, Plaintiff's only purportedly direct evidence of NJSEA's participation in the decision to exclude him from the

Meadowlands is the statement in Mr. Koch's December 27, 2011 letter, that Plaintiff's exclusion is "in the best interest of the ownership of this facility." (Ver. Compl., Ex. B.) The Court is not satisfied that this statement implicates NJSEA in the decision to exclude Plaintiff, particularly since the letter is on NMR letterhead, and is from the Director of Racing for NMR. Given that NMR has just commenced a projected 31-year tenancy and operation of the Meadowlands facility, Mr. Koch's reference to the "owner" of the racetrack would appear to be a reference to NMR, not a reference to the State of New Jersey's ownership interest in the leased property.

In sum, as in *Crissman*, there is no evidence at this stage to indicate that Plaintiff's exclusion from the Meadowlands is fairly attributable to the state, as opposed to NMR exercising its common law right, as a private operator of a horse-racing facility, to exclude Mr. Pena from the racetrack.[5] *See Martin v. Monmouth Park Jockey Club*, 145 F. Supp. 439 (D.N.J. 1956), *aff'd*, 242 F.2d 344 (3d Cir. 1957). Thus, Plaintiff has failed to demonstrate a reasonable probability that his exclusion resulted from state action. Plaintiff fails to meet his burden of showing a likelihood of success on the merits, precluding the entry of preliminary injunctive relief. Accordingly, his application will be denied.

**SO ORDERED.**

                                           s/ Stanley R. Chesler
                                           Stanley R. Chesler, U.S.D.J.

Dated: January 10, 2012

---

[5] Indeed, the lease between NJSEA and NMR also recognizes NMR's right to "permit or deny the participation of owners, drivers, trainers and other Persons" at the Meadowlands racetrack. (Ver. Compl., Ex. A.1.)